## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOANNE KATCHER, Derivatively on Behalf of Nominal Defendant ABBVIE INC., | Case No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| RICHARD A. GONZALEZ, MICHAEL E. SEVERINO, ROBERT A. MICHAEL, JEFFREY R. STEWART, GLENN F. TILTON, ROBERT J. ALPERN, ROXANNE S. AUSTIN, WILLIAM H.L. BURNSIDE, FREDERICK H. WADDELL, EDWARD J. RAPP, EDWARD M. LIDDY, BRETT J. HART, MELODY B. MEYER, REBECCA B. ROBERTS, and THOMAS C. FREYMAN, | |
| Defendants, | |
| and | |
| ABBVIE INC., | |
| Nominal Defendant. | |

Plaintiff Joanne Katcher ("Plaintiff"), by and through the undersigned attorneys, brings this Verified Stockholder Derivative Complaint for the benefit of nominal defendant, AbbVie Inc. ("AbbVie" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duty, violations of the Securities Exchange Act of 1934 (the "Exchange Act"), contribution and indemnification, and unjust enrichment.  Plaintiff's allegations are based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including without limitation: (i) review

and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings, in the related securities fraud class action captioned *Nakata, et al. v. AbbVie Inc., et al.*, No. 1:22-cv-01773 (the "Securities Class Action") pending in this District; and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts and slides, and other information available in the public domain.

## I.   NATURE AND SUMMARY OF THE ACTION

1.      AbbVie is one of the world's largest pharmaceutical companies.  Its biggest drug, Humira, is an anti-inflammatory drug used to treat illnesses such as Crohn's disease, ulcerative colitis, rheumatoid arthritis ("RA"), and more.  Humira accounts for more than one third of AbbVie's net revenue, bringing in $20 billion in 2021, making it the world's best-selling prescription drug.

2.      Humira's patent protection will expire in 2023, exposing it to competition from biosimilar generics.  The expected result is that Humira's sales are expected to decline drastically over the next several years.

3.      With this expectation, AbbVie's future revenue and earnings hinge on the Company's ability to develop new sources of revenue to offset disappearing Humira sales.

4.      The Company championed a new drug, Rinvoq, as having blockbuster potential for the treatment of RA and other illnesses.  Rinvoq is an anti-inflammatory drug manufactured by AbbVie that works by inhibiting Janus kinase ("JAK") enzymes from acting as a pathway for cytokines, which play a role in inflammation associated with many of RA's deleterious effects.

5.      Rinvoq was initially approved in the United States to treat only moderate to severe RA, but AbbVie was actively pursuing additional treatment indications.  In 2020, AbbVie asked

the U.S. Food and Drug Administration (the "FDA") to approve Rinvoq for the treatment of several other diseases, including psoriatic arthritis, ankylosing spondylitis, and atopic dermatitis.

6.      JAK inhibitors, such as Rinvoq are not without side effects.  The FDA required that other JAK inhibitor drugs, including Xeljanz and Xeljanz XR (collectively, "Xeljanz"), manufactured by Pfizer Inc. ("Pfizer"), and Olumiant, manufactured by Eli Lilly and Company ("Eli Lilly"), go through an additional safety trial to evaluate Xeljanz's risk of certain serious adverse effects compared with non-JAK inhibitor anti-inflammatory drugs.  Beginning in February 2019, the FDA repeatedly warned the public that the Xeljanz safety trial indicated that certain dosages of Xeljanz were associated with elevated risks of serious heart-related issues, cancer, and other adverse events.

7.      Given this backdrop, AbbVie touted Rinvoq as far safer and different than Xeljanz, despite their pharmacological similarities, and downplayed the FDA's statements about Xeljanz.

8.      This was not the case.  On June 25, 2021, AbbVie revealed that the FDA would not complete its review of several of the expanded treatment indications for Rinvoq by the end of June, as previously announced, due to its ongoing evaluation of safety concerns associated with Xeljanz.

9.      A few months later, on September 1, 2021, the FDA announced that final results from the Xeljanz safety trial established an increased risk of serious adverse events, even with low doses of Xeljanz.  As a result, the FDA determined that it would require new and updated warnings for Xeljanz and Rinvoq because Rinvoq "share[s] similar mechanisms of action with Xeljanz" and "may have similar risks as seen in the Xeljanz safety trial."  The FDA also indicated that it would further limit approved indications for Rinvoq as a result of these safety concerns.

10.      In the wake of this disclosure, AbbVie's market capitalization plunged by over $15 billion.  Further, as a direct result of this unlawful course of conduct, AbbVie is now the subject

of at least one federal securities class action lawsuit in this District on behalf of investors who purchased AbbVie stock.

11.    In addition, these false statements were only made possible as a result of the Company's inadequate corporate governance.  Stockholders have recognized this problem, as AbbVie has been sued for such notable legal failures as violating antitrust laws.  These concerned stockholders asked for the Company's fellow stockholders to vote to separate AbbVie's role of CEO and Chairman of the Board, and thereby include AbbVie's governance.  The Board, however, urged stockholders to reject the proposal.  In doing so, the Board made a series of false statements about its oversight and passed those off as fact in violation of federal securities laws.

12.    Plaintiff has not made a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of twelve members, half of whom are members of the Audit Committee that failed in their duties to oversee risk management of the Company and allowed misleading statements to be disseminated to the public.  Additionally, Defendant Richard A. Gonzalez ("Gonzalez") is both CEO and Chairman of the Board and named as a defendant in the Securities Class Action.  As a result, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.    JURISDICTION AND VENUE

13.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) and SEC Rule 14a-9 thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401 because (i) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (ii) the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AbbVie, occurred in this District; and (iv) one or more of the Defendants either resides in or maintains executive offices in this District.

III.    PARTIES

**Plaintiff**

15.     Plaintiff has held shares of AbbVie since at least August 2017, and has continually owned stock since that date.

**Nominal Defendant**

16.     Nominal Defendant AbbVie is a Delaware corporation with principal executive offices located at 1 North Waukegan Road, North Chicago, Illinois.  AbbVie is a global research-based biopharmaceutical company which develops and markets advanced therapies that address some of the world's most complex and serious diseases.  AbbVie trades on the New York Stock Exchange under "ABBV."

**Defendants**

17.     Defendant Gonzalez has been AbbVie's CEO, Chairman of the Board, and director since January 2013.  Defendant Gonzalez is named as a defendant in the Securities Class Action. In 2021, AbbVie compensated Defendant Gonzalez a total of $23,912,154 and in 2020, a total of $24,007,591 as an executive.

18.     Defendant Michael E. Severino ("Severino") has been AbbVie's Vice Chairman and President since December 2018.  Defendant Severino was also AbbVie's Chief Scientific Officer, Executive Vice President, Research and Development from May 2014 to December 2018. Defendant Severino is also a named defendant in the Securities Class Action.  In 2021, AbbVie compensated Defendant Severino a total of $11,049,920 and in 2020, a total of $13,411,058 as an executive.

19.     Defendant Robert A. Michael ("Michael") has been AbbVie's Vice Chairman, Finance and Commercial Operations since December 2021 and Chief Financial Officer since October 2018. Defendant Michael was also Executive Vice President from October 2018 to December 2021; Vice President, Controller from March 2017 to October 2018; Vice President, Treasurer from 2015 to March 2017; Vice President, Controller, and Commercial Operations from 2013 to 2015; and Vice President, Financial Planning and Analysis from 2012 to 2013.  Defendant Michael is named as a defendant in the Securities Class Action.  In 2021, AbbVie compensated Defendant Michael a total of $11,667,666 and in 2020, a total of $13,494,629 as an executive.

20.     Defendant Jeffrey R. Stewart ("Stewart") has been AbbVie's Executive Vice President, Chief Commercial Officer since March 2021.  Defendant Stewart was also Senior Vice President, U.S. Commercial Operations from 2018 to March 2021; and President, Commercial Operations from 2013 to 2018.  Defendant Stewart is named as a defendant in the Securities Class Action.  In 2021, AbbVie compensated Defendant Stewart a total of $9,013,096 as an executive.

21.     Defendant Glenn F. Tilton ("Tilton") has been AbbVie's Lead Independent Director and a director since January 2013.  Defendant Tilton has been a member of AbbVie's Audit Committee since at least March 2020.  In 2021, AbbVie compensated Defendant Tilton a total of $392,055 and in 2020, a total of $394,550 as a director.

22.    Defendant Robert J. Alpern ("Alpern") has been an AbbVie director since January 2013.  In 2021, AbbVie compensated Defendant Alpern a total of $370,989 and in 2020, a total of $377,334 as a director.

23.    Defendant Roxanne S. Austin ("Austin") has been an AbbVie director since January 2013.  Defendant Austin was the Chair of AbbVie's Audit Committee and a member of that committee from at least March 2020 to at least March 2021.  In 2021, AbbVie compensated Defendant Austin a total of $360,487 and in 2020, a total of $357,851 as a director.

24.    Defendant William H.L. Burnside ("Burnside") has been an AbbVie director since January 2013.  Defendant Burnside has been a member of AbbVie's Audit Committee since at least March 2020.  In 2021, AbbVie compensated Defendant Burnside a total of $340,904 and in 2020, a total of $338,851 as a director.

25.    Defendant Frederick H. Waddell ("Waddell") has been an AbbVie director since November 2012.  Defendant Waddell has been a member of AbbVie's Audit Committee since at least March 2020.  In 2021, AbbVie compensated Defendant Waddell a total of $340,904 and in 2020, a total of $340,170 as a director.

26.    Defendant Edward J. Rapp ("Rapp") has been an AbbVie director since January 2013.  Defendant Rapp has been a member of AbbVie's Audit Committee since at least March 2020.  In 2021, AbbVie compensated Defendant Rapp a total of $360,904 and in 2020, a total of $360,172 as a director.

27.    Defendant Edward M. Liddy ("Liddy") has been an AbbVie director since January 2013.  In 2021, AbbVie compensated Defendant Liddy a total of $318,237 and in 2020, a total of $327,851 as a director.

28.     Defendant Brett J. Hart ("Hart") has been an AbbVie director since May 2016. In 2021, AbbVie compensated Defendant Hart a total of $354,904 and in 2020, a total of $352,851 as a director.

29.     Defendant Melody B. Meyer ("Meyer") has been an AbbVie director since May 2017. Defendant Meyer has been a member of AbbVie's Audit Committee and has been since at least March 2020. In 2021, AbbVie compensated Defendant Meyer a total of $340,904 and in 2020, a total of $338,851 as a director.

30.     Defendant Rebecca B. Roberts ("Roberts") has been an AbbVie director since May 2018. In 2021, AbbVie compensated Defendant Roberts a total of $334,904 and in 2020, a total of $332,851 as a director.

31.     Defendant Thomas C. Freyman ("Freyman") has been an AbbVie director since May 2020. Defendant Freyman was also an AbbVie director from November 2012 to January 2013. Defendant Freyman has been Chair of AbbVie's Audit Committee since at least March 2022. In 2021, AbbVie compensated Defendant Freyman a total of $349,487 and in 2020, a total of $262,017 as a director.

32.     Defendants Gonzalez, Severino, Michael, and Stewart are sometimes referred to hereinafter as the "Officer Defendants." Defendants Gonzalez, Tilton, Alpern, Austin, Burnside, Waddell, Rapp, Liddy, Hart, Meyer, Roberts, and Freyman are sometimes referred to hereinafter as the "Director Defendants." The Officer Defendants and Director Defendants collectively are sometimes referred to hereinafter as the "Individual Defendants." Defendants Freyman, Burnside, Meyer, Rapp, Tilton, and Waddell are sometimes referred to hereinafter as the "Audit Committee Defendants."

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background**

33.    AbbVie, a Delaware corporation with principal executive offices in North Chicago, Illinois, is one of the world's largest pharmaceutical companies.  Its biggest drug, Humira—an anti-inflammatory drug used to treat illnesses such as Crohn's disease, ulcerative colitis, RA, and more—was, in 2021 (aside from COVID-19 vaccines), the world's best-selling prescription drug, with net revenues of more than $20 billion in 2021. In 2021, sales of Humira accounted for approximately 37% of AbbVie's total net revenue—with AbbVie's next-best-selling drug, Imbruvica, accounting for less than 10% of AbbVie's net revenue.

34.    While AbbVie has protected Humira's blockbuster profits for years with a "patent thicket" of more than 100 patents, certain biosimilar drugs—that is, direct competitors to Humira—will be permitted to enter the market beginning in 2023 under agreements settling patent litigation between AbbVie and other pharmaceutical companies.

35.    Because profits for brand name drugs (like Humira) typically plummet when biosimilar or generic versions enter the market, AbbVie's revenue and earnings are expected to decline significantly when Humira loses complete patent protection.  Indeed, during an earnings call on February 2, 2022, Defendant Gonzalez warned that the Company expected to see "45% erosion, plus or minus 10%," in Humira sales following the introduction of biosimilar competitors in 2023.  As such, industry analysts and experts have reported that AbbVie is looking to its other drugs—including Rinvoq, another type of anti-inflammatory drug—to make up for declining Humira sales.

36.    However, Rinvoq currently accounts for only a small portion of AbbVie's revenues—approximately $1.7 billion in 2021, or just under 3% of AbbVie's total net revenue. Notably, Rinvoq was initially approved in the United States to treat only moderate to severe RA,

and its revenues were expected to increase substantially if the FDA approved Rinvoq for the treatment of additional diseases. The FDA's approval of additional treatment indications for Rinvoq was and is therefore critical to the Company's ability to offset lost Humira sales. In 2020, AbbVie submitted a series of supplemental New Drug Applications seeking the FDA's approval of Rinvoq for the treatment of psoriatic arthritis, ankylosing spondylitis, and atopic dermatitis (collectively, the "sNDAs").

37. As is relevant here, Rinvoq treats disease by inhibiting JAK enzymes. Rinvoq uses the same mechanism of action as several other JAK inhibitor drugs, including Pfizer's Xeljanz and Eli Lilly's Olumiant.

38. When the FDA approved Xeljanz for the treatment of RA in 2012, it required Pfizer to conduct an additional safety trial (the "ORAL Surveillance Trial") to evaluate Xeljanz's risk of serious heart-related events and cancer when compared with other anti-inflammatory drugs that were not JAK inhibitors. In February 2019, the FDA alerted the public that, according to interim data from the ongoing ORAL Surveillance Trial, RA patients taking 10 mg twice daily doses of Xeljanz were subject to increased risks of blood clots in the lungs, and of death, compared to patients treated with smaller doses of Xeljanz or with a non-JAK inhibitor drug. Several months later, in July 2019, the FDA further warned the public that ulcerative colitis patients taking 10 mg twice daily doses of Xeljanz were also subject to increased risks of blood clots in the lungs and of death.

39. Then, in February 2021, the FDA issued an alert warning that preliminary results from the now-complete ORAL Surveillance Trial "show an increased risk of serious heart-related problems and cancer with [Xeljanz] compared to another type of medicine called tumor necrosis factor (TNF) inhibitors."

**B.** **The Individual Defendants Caused the Company to Issue Materially False and Misleading Statements**

40.     Despite the serious safety concerns regarding Xeljanz and JAK inhibitors, AbbVie presented Xeljanz's safety issues as unique to that drug and not indicative of JAK inhibitors in general.

41.     On April 30, 2021, the Company held a conference call with analysts and investors to discuss its financial results for the first quarter of the 2021 fiscal year. Analysts were interested in what the recent news from the FDA on Xeljanz meant for Rinvoq. Defendant Stewart stated, "What we have heard is when we do some of our research and our ear to the ground, we clearly see that oral surveillance is perceived as a Xeljanz issue."

42.     During that same call, defendants Gonzalez and Severino also discussed expanding Rinvoq's use to additional treatments. In particular, Defendant Gonzalez stated:

> I'm also extremely pleased with our R&D prospects, including the number and potential of the opportunities, especially within our late-stage pipeline. We're on the cusp of the potential commercial approval of more than a dozen new products or indications over the next 2 years, including … expanded indications for Rinvoq in psoriatic arthritis, ankylosing spondylitis and atopic dermatitis.

43.     In particular, Defendant Severino stated:

> Our regulatory submissions are currently under review for Rinvoq in 3 new indications in the U.S., ankylosing spondylitis, psoriatic arthritis and atopic dermatitis. As we previously announced, the FDA recently extended the review period for Rinvoq in psoriatic arthritis and atopic dermatitis, following a request for an updated assessment of the benefit-risk profile for Rinvoq in these indications. In response to the FDA request, we provided updated data from across Rinvoq programs in RA, psoriatic arthritis and atopic dermatitis. Based on the review extensions, we now expect approval decisions for psoriatic arthritis in June and for atopic dermatitis in July. The regulatory action date for Rinvoq in ankylosing spondylitis is unchanged and remains on track for June. We remain confident in the benefit-risk profile of Rinvoq across all indications, and we'll work with the FDA to bring Rinvoq to market in these new disease areas.

44.     On May 25, 2021, Defendants Stewart, Severino, and Michael presented on behalf of AbbVie at the UBS Global Healthcare Virtual Conference. During the conference, Defendant

Severino implicitly acknowledged the overlap between Xeljanz and Rinvoq, while also claiming

Rinvoq was safer. In particular, he stated:

> With respect to the label, I think it's early to speculate, we don't know what
> XELJANZ labeling will look like and that is obviously a key component of the
> story. But what I would say is, we remain very confident in the data that we've
> generated for RINVOQ. We have a very large data set, more than 10,000 patient
> years of follow-up. We have long-term randomized data, and we know that those
> randomized data, controlled data are the most impactful, with the agency when
> looking at safety questions like the ones that they're examining, we have 3-year data
> in RA. We have 1-year data in psoriatic arthritis. We have large safety databases
> across all of the indications that we are pursuing.
>
> And those data have not shown a signal with our agent, with RINVOQ, for the
> adverse experiences that are being evaluated with XELJANZ and with others.
> Specifically, we've not seen increased rates of VTE or PE. We've not seen increased
> rates of cardiovascular events or MACE events, and we've not seen increased risk
> for malignancy. And if you look at the track record here, we've been very successful
> in getting our data into the label so they're well understood by prescribing
> physicians.
>
> And if one looks at the RA launch, we had our data in the label for RA, both our
> efficacy and our safety data. I think they well characterize the benefit risk of the
> molecule in that launch. Performed very well. In fact, it exceeded our expectations,
> so we feel good about the opportunities that are in front of us for psoriatic arthritis,
> for atopic dermatitis and ankylosing spondylitis, which are the indications that are
> under review. And of course, we have more indications that are still in Phase III
> and we feel confident in those as well.

45.     On June 2, 2021, Defendants Severino and Michael presented on behalf of AbbVie

at the Sanford C. Bernstein Strategic Decisions Virtual Conference. In response to an analyst's

question, defendant Severino stated that Xeljanz's issues were unique to that drug and implied that

Rinvoq's performance was improving due to physicians moving away Xeljanz. In particular, the

following exchange took place:

> [Analyst]: Okay. So the other question is the impact of all this debate on physician
> behavior. Within RA, are we seeing patients -- are you seeing physician gradually
> moving away from XELJANZ? Is there a moving towards RINVOQ away from
> XELJANZ as a result of the heightened safety concern around XELJANZ?
>
> [Defendant Severino]: Well, in the RA market, what we see is RINVOQ continues
> to perform very strongly. And its trajectory continues along a path that we would

expect. So the XELJANZ issue seems to be viewed by the prescribing community as specific to XELJANZ. So you see a change in the XELJANZ performance, but RINVOQ's performance has continued.

[Analyst]: Have you gained from the XELJANZ's problems?

[Defendant Severino]: Well, we've continued to grow and so we're picking up patients from a variety of sources. We're picking up patients from many other therapies. It's hard to say what a doc would have prescribed 6 months ago versus what they're prescribing today, but we're continuing to gain and our in-play share is very strong.

46.    Defendant Severino also claimed that the Company was moving forward and expected FDA approval on using Rinvoq for the treatment of atopic dermatitis. In particular, the following exchange took place:

[Defendant Severino]: So the PDUFA date for the atopic derm indication, which is I assume the indication that you're referring to, had been April and it moved 3 months so it's now in July. So early in the third quarter. And we feel like we are making appropriate progress with the -- our ability to provide answers to the FDA, provide them the data that they have requested, and we feel good about the overall progress we're making there. And we feel very confident in that overall profile and our ability to gain an approval in that indication.

With respect to an AdCom, I don't think an AdCom is likely at all. And the reason for that is that if the FDA were planning an AdCom, they would already be setting that in motion. We would absolutely expect them to have reached out to us. We'd expect them to be deep in preparation for an AdCom and they're not. So while they still have the authority to do that, it seems very unlikely that they will for that simple reason. And if you look at their track record here, they have made these decisions on their own, based on their own review of the data in this class, pretty consistently.

If you look at the RINVOQ RA application, that was in review at the time that the baricitinib, DVT, PE issue came to light. And there was speculation at that time that there would be an AdCom before they could act on the RA application. And there was not. The FDA made their decision based on the data that we provided them and based on their own review of those data. And the outcome there was a good one and the label that we achieved was a good one. And it supported the very robust launch in RA that quite frankly exceeded our expectations and I think exceeded expectations broadly speaking.

[Analyst]: Okay. So the other question is, are we at the -- is there still a go, a back-and-forth in things like the label language? Is the overall review still progressing with the exception of that question of the safety profile of the class? Or is this kind

of done and that's the last gating factor? Or is everything delayed and will we start somewhere in June? Can I -- can you give us a little bit more color on this?

[Defendant Severino]: I would say that the **review of the file is progressing in a way that's very consistent with our expectations**. We -- we're asked in April to supply some additional data. We supplied those data. We viewed the data as supportive of our overall application and very consistent with everything that we've said about product safety and efficacy. And ***I would say that the file is progressing as we would have expected***.

[Analyst]: A kind of like label discussion at this point or close enough to closing the last gaps in what needs to get done before approval. Is that kind of like the overall picture?

[Defendant Severino]: Yes. I mean we usually don't comment on the specifics of exact label discussions until they're finalized. But I would say **we're making the progress that we would expect and we believe we're on track for an approval on the new PDUFA date**.

47.     At the Goldman Sachs Global Healthcare Virtual Conference held on June 8, 2021,

Defendant Severino again claimed that there were notable differences between Xeljanz and Rinvoq

when it came to both efficacy and safety. In particular, he stated:

Well, we certainly have seen differences in JAKs with respect to performance and with respect to a number of safety issues, if you look across the class. And while people talk about the JAK class in aggregate, **there are very significant differences in specificity for JAK type, and those can drive real differences in performance**, **both from a safety and an efficacy perspective**. **And we've consistently had very strong data in both perspectives**.

Obviously, most of the attention now comes after the results of the XELJANZ oral surveillance study and the results that were demonstrated there on MACE and malignancy. So failing to clear their safety boundary for those 2 events in a study that was a post-marketing requirement, going way back to their original approval.

What I would say there is we've looked for those events very carefully within our program. We have a large database. We have more than 10,000-patient years' experience in our clinical trials database that we have examined for these events. We adjudicate these events. We have very rigorous methods to try to make sure that we are capturing all events that are occurring. And those databases have not shown a signal for increased risk. And that's true whether you look compared to baseline rates or within the controlled portions of those programs where you have long-term control data against Humira, principally, and other agents as well. We've not shown evidence of increased risk for MACE, for malignancy, for DVT and PE. So **we feel confident in the profile that we've described**.

14

And I think it's challenging to predict how they will come down on labeling across each member of the class. But what I would *say is we have been successful in making sure that our data are reflected in our label, and that's been well understood by prescribing physicians*. And if you go back, as an analogy, if you will, to the RA approval, which occurred right around the time that the DVT and PE issue was the focus for baricitinib, we had data in our label that described our experience. Those data were well understood by physicians, and *the uptake has been very robust in that indication. And so I think we're in a very similar position here*.

48.     Each of the above statements in ¶¶40–47 were materially misleading because they failed to disclose:

   a.   Rinvoq was sufficiently similar to Xeljanz as a JAK inhibitor that the FDA would find the safety concerns from the ORAL Surveillance study also applied to Rinvoq;

   b.   the FDA would require significant safety warnings for Rinvoq in light of the ORAL Surveillance study; and

   c.   the FDA would delay approval of any additional treatment uses of Rinvoq in light of safety concerns.

**C.    The Misleading Proxy Statement**

49.     The Director Defendants breached their fiduciary duties and violated section 14(a) of the Exchange Act by making false and misleading statements while recommending stockholders make certain votes.  In particular, on March 22, 2021, the Director Defendants caused AbbVie to file with the SEC its Proxy Statement in connection with the 2021 Annual Meeting of Stockholders (the "Proxy").  The Proxy solicited stockholder votes on AbbVie's amended and restated 2013 incentive stock program and on having an independent Chair of the Board.  The Board recommended voting for the amended and restated 2013 incentive stock program and against having an independent Chair of the Board.

50.     In recommending that stockholders vote in favor of the amended and restated 2013 incentive stock program, the Board claimed that the equity awards "align the interests of our employees, officers and non-employee directors with those of other stockholders."  In particular, the Proxy stated:

> The purpose of the Amended Plan is to attract and retain outstanding employees, officers, and non-employee directors of AbbVie and its subsidiaries and to motivate such individuals by providing opportunities to acquire AbbVie shares of common stock or to receive payments based on the value of such shares or on the financial performance of AbbVie, or both, on advantageous terms and to further align such persons' interests with those of AbbVie's other stockholders.

> *       *       *

> Equity incentives align the interests of our employees, officers and nonemployee directors with those of other stockholders. AbbVie believes that equity incentives motivate recipients to focus on behaviors that, over time, lead to sustained growth in stockholder value.

51.     The Proxy also stated:

> AbbVie does not include certain pay design features that may have the potential to encourage excessive risk-taking, such as: over-weighting toward annual incentives, highly leveraged payout curves, unreasonable thresholds or dramatic changes in payout opportunity at certain performance levels that may encourage inappropriate short-term business decisions to meet payout thresholds. In addition, a limit of 200% of target applies to any awards made under the NEO short-term incentive plan.

> AbbVie's long-term incentive program focuses NEOs on longer-term operating performance and aligns NEOs with stockholder interests through the use of multi-year performance periods and multiple performance measures, including relative total stockholder return.

52.     The statements above in ¶¶50–51 were untrue because the material terms of the performance goals in the amended and restated 2013 incentive stock program did not encourage proper risk oversight, nor advance long-term stockholder value.  For example, by focusing on total stockholder return, the amended and restated 2013 incentive stock program incentivizes executives to mislead the market to inflate the Company's stock price.

53.    Certain stockholders proposed that AbbVie adopt a policy and amend its bylaws as necessary to require that the Chairman of the Board is an independent director, as opposed to the CEO.  The stockholders explained: "In light of rising material legal, regulatory, financial and reputational risks, as well as the controversies and legal challenges facing the company we are concerned that the Board is not providing the necessary oversight of the company's culture, strategy, and risk management."

54.    The Board recommended that stockholders vote against the stockholder proposal due, at least in part to its claim that

> AbbVie has other robust corporate governance practices designed to protect longterm shareholder value. … Other corporate governance practices, which are highlighted in our Governance Guidelines (available at www.abbvieinvestor.com) and throughout this proxy statement, include a comprehensive board risk management oversight process[.]

55.    Other statements concerning the Company's corporate governance contained in the Proxy included: "Our board of directors is committed to strong corporate governance tailored to meet the needs of AbbVie and its stockholders to enhance long-term stockholder value."

56.    The Proxy also explicitly referenced AbbVie's corporate governance guidelines and policies located at its website, stating:

> AbbVie's corporate governance guidelines with the outline of directorship qualifications; director independence guidelines; code of business conduct; and audit committee, compensation committee, nominations and governance committee, and public policy committee charters are all available in the corporate governance section of AbbVie's investor relations website at www.abbvieinvestor.com.

57.    The website explicitly referenced in the Proxy leads stockholders to a "Code of Business Conduct" (the "Code"). The Code claims that AbbVie "follow[s] industry laws and regulations"; "maintain[s] high standards in research & development" and "maintain[s] trustworthy business practices"; and "communicate[s] with the public appropriately."

58.     Specifically, the Code states:

We maintain trustworthy business practices.

We comply with all applicable laws that regulate our business.

We conduct our business in a transparent and ethical manner and comply with all applicable laws.

*       *       *

We communicate with the public appropriately

It is a privilege to share the pride of our accomplishments with the world. When we share information, the public expects us to be consistent and accurate.

59.     The statements above in ¶¶53–58 were untrue because AbbVie was misleading the market about Rinvoq, the drug's similarities to Pfizer's JAK inhibitor, and the likelihood of FDA action on Rinvoq.

60.     On May 5, 2021, AbbVie held its Annual Meeting of Stockholders. As a direct result of the misleading statements, the Company's stockholders approved the amended and restated 2013 incentive stock program and did not approve the stockholder proposal for a policy where the Chairman of the Board is an independent director.

**D.     The Truth Emerges**

61.     On June 25, 2021, AbbVie announced that the FDA would not complete its review of the sNDAs regarding psoriatic arthritis and ankylosing spondylitis in June, as Defendants had represented.  Defendants revealed that the FDA had, in explaining the delay, "cited its ongoing review of Pfizer's post-marketing study, ORAL Surveillance."

62.     Several weeks later, on July 16, 2021, AbbVie announced that the FDA had also extended its review of the sNDA regarding atopic dermatitis, again citing the ORAL Surveillance Trial.

63.     Despite these developments, Defendants continued to assure investors that Rinvoq's safety data was strong and problems were a Xeljanz specific issue.  For example, during the Company's quarterly earnings call on July 30, 2021, Defendant Severino represented that— despite the FDA's delay—"[w]e remain confident in the benefit risk profile for Rinvoq across all indications."  Defendant Stewart also reiterated that AbbVie's data on Rinvoq was "very significant[ly] differentiated" from the problematic data on Xeljanz.  Moreover, Defendant Gonzalez touted the Company's guidance for future Rinvoq revenue, stating that the Company projected $8 billion in Rinvoq sales in 2025.

64.     On September 1, 2021, the FDA announced that the final results of the ORAL Surveillance Trial showed "an increased risk of serious heart-related events such as heart attack or stroke, cancer, blood clots, and death" even with lower doses of Xeljanz. Accordingly, the FDA further stated that it would require "new and updated warnings" not only for Xeljanz, ***but also for both Rinvoq*** and Olumiant.  The FDA explained that, "since they share mechanisms of action with Xeljanz, [the] FDA considers that these medicines may have similar risks as seen in the Xeljanz safety trial."  Moreover, the FDA also revealed that it would further limit approved uses of Rinvoq, Xeljanz, and Olumiant, permitting these drugs to be prescribed only for "certain patients who have not responded [to] or cannot tolerate one or more TNF blockers."

65.     The FDA's announcement precluded any chance of Rinvoq becoming AbbVie's next big drug and replacing Humira.  Investors noticed.  That day the Company's market capitalization fell over $15 billion..  The price of AbbVie common stock declined $8.51 per share, or more than 7%, from a close of $120.78 per share on August 31, 2021, to close at $112.27 per share on September 1, 2021.

66.     As analysts and industry experts noted, the FDA's announcement affected AbbVie's prospects particularly strongly, given AbbVie's reliance on Rinvoq to provide much more substantial profits in the future.  For example, *Bloomberg* noted that "AbbVie's stock was hit particularly hard [from this news] as Rinvoq is supposed to be the company's next big drug" after Humira loses its patent-protected monopoly.  Similarly, analysts from SVB Leerink and Bernstein warned that the FDA's label changes—particularly the new restrictions on approved uses—would likely reduce future Rinvoq sales by billions of dollars.

67.     On December 3, 2021, AbbVie revealed that the FDA had updated Rinvoq's label in accordance with the FDA's September 1, 2021 announcement.  Specifically, AbbVie stated that "the U.S. label for RINVOQ will now include additional information about the risks of malignancy and thrombosis, and the addition of mortality and MACE (defined as cardiovascular death, myocardial infarction and stroke) risks within the Boxed Warnings and Warnings and Precautions sections."  The label would also state that Rinvoq "is indicated for the treatment of adults with moderately to severely active rheumatoid arthritis who have had an inadequate response or intolerance to one or more TNF blockers"—meaning that Rinvoq can be marketed only as an alternative after other anti-inflammatory drugs have already failed.

68.     On January 11, 2022, the Company lowered its guidance for Rinvoq, stating that AbbVie "now expects 2025 risk-adjusted sales of greater than $7.5 billion for Rinvoq" (compared to the Company's prior guidance of greater than $8 billion).  Accordingly, it is clear that the FDA's safety concerns about Rinvoq—which Defendants misleadingly downplayed during the Class Period—will have a lasting, negative effect on a critical Company revenue source.

## V.     DAMAGES TO THE COMPANY

69.     As a direct and proximate result of the Individual Defendants' misconduct, AbbVie has been seriously harmed and will continue to be.  Such harm includes, but is not limited to: (i)

legal fees incurred in connection with the defense of the Securities Class Action; (ii) any funds paid to settle or fund a judgment entered in the Securities Class Action; and (iii) costs incurred from unjust and unwarranted compensation and benefits paid to the Individual Defendants who have breached their duties to AbbVie.

70.     In addition, AbbVie's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

71.     These actions have irreparably damaged both AbbVie's corporate image and goodwill.  For at least the foreseeable future, AbbVie will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that AbbVie's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

## VI.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

72.     By reason of their positions as officers and/or directors of AbbVie and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.

73.     Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

74.     In *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors." The officers of a Delaware corporation are "expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care)." *Hampshire Grp., Ltd. v. Kuttner*, C.A. No. 3607-VCS, 2010 WL 2739995, at \*11 (Del. Ch. July 12, 2010).

75.     Because of their positions of control and authority as officers and/or directors of AbbVie, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with AbbVie, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

76.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AbbVie and was at all times acting within the course and scope of such agency.

77.     To discharge their duties, the officers and directors of AbbVie were required to exercise reasonable and prudent supervision over the management, policies, practices and controls

of the Company.  By virtue of such duties, the officers and directors of AbbVie were required to, among other things:

> (a)   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> (b)   Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> (c)   Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of AbbVie are conducted in accordance with all applicable laws, rules, and regulations;
>
> (d)   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and
>
> (e)   Truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

78.   Additionally, as a part of their duties of care and loyalty, the Individual Defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to AbbVie shareholders, or the market generally, about the business of the corporation.  *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.") (citation omitted); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures.  The law of partial disclosure is likewise clear: 'Once defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an

accurate, full, and fair characterization of those historic events.'") (citation omitted); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the defendants breached their fiduciary duty of candor when they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

79. As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007), "[w]hen . . . directors communicate with shareholders, they also must do so with complete candor":

> Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

**B.    Audit Committee Duties**

80. The charter for the Audit Committee charges members with responsibility for, among other things, "assisting the [Board] in fulfilling its oversight responsibility with respect to: . . . . AbbVie's enterprise risk management, including major financial risk exposures (recognizing that other board committees assist the Board in reviewing certain aspects of risk management)."

81. Specifically regarding risk management, the charter states that the Audit Committee shall:

> Review and discuss (with management, the internal auditors and the independent auditors, as appropriate) AbbVie's enterprise risk management, including major financial risk exposures, and the steps management has taken to monitor and control those exposures, including AbbVie's risk assessment and risk management policies. Coordinate the oversight of risk management with other Board committees (recognizing that other committees also assist the Board in reviewing certain aspects of risk management).

**VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

82. Plaintiff brings this action derivatively in the right and for the benefit of AbbVie to redress injuries suffered, and to be suffered, by AbbVie as a direct result of breaches of fiduciary

duty by the Individual Defendants, unjust enrichment, and violations of federal securities laws. AbbVie is named as a nominal defendant solely in a derivative capacity.

83.     Plaintiff will adequately and fairly represent the interests of AbbVie in enforcing and prosecuting its rights.

84.     Plaintiff has continuously been a shareholder of AbbVie at times relevant to the wrongdoing complained of and is a current AbbVie shareholder.

85.     AbbVie's Board consists of twelve directors. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Employee – Defendant Gonzalez**

86.     At all relevant times, Gonzalez was AbbVie's CEO, and therefore was not independent under NYSE listing rules. As an employee and director of AbbVie, Gonzalez was substantially involved with AbbVie's operations and products, as detailed in the Proxy. Therefore, he knew or should have known of the risks associated with Rinvoq and other JAK inhibitors, as well as FDA reactions. Moreover, as CEO and as alleged herein, Gonzalez personally issued the misleading statements alleged herein and is named as a defendant in the Securities Class Action. As a result, Gonzalez would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**The Audit Committee – Defendants Freyman, Burnside, Meyer, Rapp, Tilton, and Waddell**

87.     Freyman, Burnside, Meyer, Rapp, Tilton, and Waddell served as members of the Audit Committee of AbbVie at relevant times during which the misconduct took place. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its risk management. As alleged herein, defendants Freyman, Burnside,

Meyer, Rapp, Tilton, and Waddell failed to oversee the risks impacting the Company, namely the safety concerns with JAK inhibitors and related FDA actions, allowing the materially misleading statements to be disseminated in AbbVie's SEC filings and other disclosures. Thus, Freyman, Burnside, Meyer, Rapp, Tilton, and Waddell breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Demand Is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability – Defendants Gonzalez, Tilton, Alpern, Austin, Burnside, Waddell, Rapp, Liddy, Hart, Meyer, Roberts, and Freyman**

88.     Demand is futile as to the Demand Board for the additional reason that Defendants Gonzalez, Tilton, Alpern, Austin, Burnside, Waddell, Rapp, Liddy, Hart, Meyer, Roberts, and Freyman face a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and/or care by violating Section 14(a) of the Exchange Act by negligently making material misstatements and omitting material facts in connection with their proxy solicitations, as described herein.

89.     Accordingly, Defendants Gonzalez, Tilton, Alpern, Austin, Burnside, Waddell, Rapp, Liddy, Hart, Meyer, Roberts, and Freyman all face a substantial likelihood of liability for their breaches of fiduciary duty and violations of state and federal law, making any demand upon them futile.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### Breaches of Fiduciary Duties
### (Against the Individual Defendants)

90.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AbbVie's business and affairs, particularly with respect to issues as fundamental as public disclosures.

92.     In direct violation of these duties, defendants, and each of them, knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the effects of increased competition on the Company's business, and, as a result of the foregoing, AbbVie's public statements were materially false and misleading at all relevant times.  Through their fraudulent scheme, defendants artificially inflated the Company's financials, and its stock price.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

93.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AbbVie.

94.     In addition, in breach of their fiduciary duties owed to AbbVie, the Individual Defendants willfully participated in and caused the Company to unnecessarily expend unwarranted amounts of corporate funds in connection with the unjust compensation paid to the Individual Defendants while in breach of their fiduciary duties during the relevant period.  .

95.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AbbVie has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability in the Securities Class Action, and a loss

of goodwill in the capital markets.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

## COUNT II

**Violations of Section 14(a) of the Securities Exchange Act of 1934
(Against the Director Defendants)**

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's Proxy violated §14(a) and Rule 14a-9 because solicited stockholder approval for the Business Combination while failing to disclose material facts about AbbVie's business.

98.     In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy were materially false and misleading.

99.     The misrepresentations and omissions in the Proxy were material to Company shareholders in voting on the Proxy.  The Proxy solicited shareholder votes for, among other things,: (i) the election of Defendants Burnside, Freyman, Hart, and Rapp as directors; (ii) an advisory vote on executive compensation; (iii) rejection of an independent chair of the Board; (iv) rejection of a stockholder proposal on limiting termination pay; and (v) rejection of the stockholder proposal on reporting on Board oversight of competition practices.  The Proxy was an essential link in the accomplishment of the continuation of the Director Defendants' continued violation of their fiduciary duties.

100.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statement.

## COUNT III

### For Contribution and Indemnification Under Delaware Law
### (Against the Individual Defendants)

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against the Individual Defendants.

103.    AbbVie is named as a defendant in the Securities Class Action. If AbbVie is ultimately found liable for violating federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Individual Defendants as alleged herein.

104.    Accordingly, AbbVie is entitled to all appropriate contribution and/or indemnification from the Individual Defendants, who are responsible for exposing AbbVie to liability under Delaware contribution and indemnification law.

105.    Plaintiff, on behalf of AbbVie, has no adequate remedy at law.

## COUNT IV

### For Unjust Enrichment
### (Against the Individual Defendants)

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AbbVie. The Individual Defendants were

unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

108.     Plaintiff, as a stockholder and representative of AbbVie, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

109.     Plaintiff, on behalf of AbbVie, has no adequate remedy at law.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of AbbVie, demands judgment as follows:

A.     Finding that a stockholder demand on the Board would have been a futile and useless act and Plaintiff may maintain this action on behalf of AbbVie and that Plaintiff is an adequate representative of the Company;

B.     Finding that the Individual Defendants violated the federal securities laws, breached their fiduciary duties to the Company, and were unjustly enriched;

C.     Finding against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, violations of federal securities laws, and unjust enrichment;

D.     Directing AbbVie to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AbbVie and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to appropriately test, and then strengthen, the Company's internal operational control functions and the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2.      a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to appropriately test, and then strengthen, the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

4.      a provision to permit the stockholders of AbbVie to nominate at least three new candidates for election to the Board; and

5.      a provision creating an Independent Chair of the Board.

E.      Finding against each of the Individual Defendants in favor of AbbVie for the amount of damages sustained by AbbVie, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

F.      Awarding to AbbVie restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by these defendants;

G.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that AbbVie's directors, officers, and employees do not engage in wrongful or illegal practices;

H.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

I.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.     Granting such other and further relief as the Court deems just and proper.

## X.     JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: July 1, 2022

*/s/ Michael K. Forde*
**FORDE & O'MEARA LLP**
191 North Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 641-1441
Facsimile: (312) 465-4801
mforde@fordellp.com

*Local Counsel for Plaintiff*

**JOHNSON FISTEL, LLP**
Michael I. Fistel, Jr.
Mary Ellen Conner
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com
MaryEllenC@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Frank J. Johnson
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Attorneys for Plaintiff*

# **VERIFICATION**

I, ___Joanne Katcher___ , herby verify that I am familiar with the allegations in the foregoing Verified Stockholder Derivative Complaint, and that I have authorized the filing of the Verified Stockholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: __6/29/2022_____

DocuSigned by:

*Joanne Katcher*

6D446C4B4C4C4F6...

Plaintiff